Filed 6/2/15  P. v. Penix CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D067480 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. FVA1100219) |
| MICHAEL WILLIAM PENIX et al., | ORDER MODIFYING OPINION AND DENYING REHEARING |
| Defendants and Appellants. | [No Change in Judgment] |

THE COURT:

It is ordered that the opinion filed herein on May 15, 2015, be modified as follows:

On page 14, the second sentence of the last paragraph is modified to read:

> After Long and Vargas had left the room and Pineda was in the shower, Penix went through Pineda's backpack, wiped a chair with a bandana, and ordered Herrera to help him unplug the telephone.

There is no change in judgment.

_____

HUFFMAN, Acting P. J.

Copies to:  All parties

Filed 5/15/15  P. v. Penix CA4/1 (unmodified version)

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D067480 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. FVA1100219) |
| MICHAEL WILLIAM PENIX et al., | |
| Defendants and Appellants. | |

APPEALS from judgments of the Superior Court of San Bernardino County, Gerard S. Brown, Judge.  Affirmed.

Dwyer & Kim and John Patrick Dwyer, under appointment by the Court of Appeal, for Defendant and Appellant Michael William Penix.

Gerald J. Miller, under appointment by the Court of Appeal, for Defendant and Appellant David Long.

Robert V. Vallandigham, Jr., under appointment by the Court of Appeal, for Defendant and Appellant Monique Nicole Vargas.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, William M. Wood and Paige B. Hazard, Deputy Attorneys General, for Plaintiff and Respondent.

## I.

## INTRODUCTION

An amended information charged Michael William Penix, David Long, Monique Vargas, and Nora Herrera with murder (count 1) (Pen. Code, § 187, subd. (a))[1] and attempted robbery (count 2) (§§ 664, 211).  The information additionally charged Penix and Long with possession of a firearm by a felon (count 3) (§ 29800, subd. (a), former § 12021, subd. (a)(1)),[2] and charged Long with unlawful driving or taking of a vehicle in violation of Vehicle Code section 10851 (count 4), and receiving stolen property (count 5) (§ 496d, subd. (a)).

The information alleged as to counts 1 and 2 that Penix personally and intentionally discharged a firearm, causing death (§ 12022.53, subd. (d)), personally discharged a firearm (§ 12022.53, subd. (c)), and personally used a firearm (§ 12022.53,

---

[1]    All statutory references are to the Penal Code unless otherwise specified.

[2]    The information cited section 12021, subdivision (a).  Section 12021 was repealed as of January 1, 2012 by 2010 legislation.  (Stats. 2010, ch. 711, § 6, operative Jan. 1, 2012.)  Section 29800, subdivision (a) continues former section 12021, subdivision (a) without substantive change.  (See Cal. Law Revision Com. com., West's Ann. Pen. Code (2012 ed.) foll. § 29800.)

subd. (b)). The information further alleged as to counts 1 and 2 that Long, Vargas, and Herrera knew that Penix was personally armed (§ 12022, subd. (d)). The information alleged that Penix had incurred 10 prior convictions for which he had served a prison term (§ 667.5, subd. (b)) (prison priors), and that Long had four prison priors and one prior strike conviction (§§ 667, subd. (b), 1170.12, subds. (a)-(d)).

Vargas and Herrera each entered into a plea bargain pursuant to which they pleaded guilty to second degree murder and agreed to cooperate with the prosecution by testifying against Penix and Long. If the court subsequently determined that they had been truthful and cooperative with the prosecution at trial, they would each be entitled to withdraw their guilty pleas to second degree murder and enter a new plea of guilty to voluntary manslaughter, with a maximum sentence of 11 years in prison.

A jury found Penix guilty of murder, robbery, and possession of a firearm (counts 1-3) and found true all of the sentence enhancement allegations against him.[3] The jury acquitted Long of the murder and robbery charges, and convicted him of possessing a firearm, unlawful driving or taking of a vehicle, and receiving stolen property (counts 3-5). After a court trial on the prior conviction allegations, the court found true six prison prior allegations against Penix, and three prison prior allegations and one strike prior allegation against Long. The court sentenced Penix to 50 years to life in prison, plus a

---

[3] The amended information and verdict form did not specify a degree of murder. However, the jury was instructed on felony murder as a theory of first degree murder. The abstract of judgment against Penix identifies the murder conviction as "1st MURDER."

determinate term of six years for the prison priors. The court sentenced Long to eight years four months in prison, including three years for his prison priors.

After Penix and Long were sentenced, the court allowed Vargas and Herrera to withdraw their guilty pleas to second degree murder and plead guilty to voluntary manslaughter.[4] The court sentenced Herrera to three years and Vargas to 11 years in state prison.

Penix, Long, and Vargas separately appeal from their judgments of conviction. Penix contends that (1) the attempted robbery and murder convictions must be reversed because the trial court did not instruct the jury on the lesser included offense of attempted theft; and (2) the first degree murder conviction must be reversed because the court did not instruct the jury on the lesser included offenses of second degree murder and voluntary manslaughter.

Long contends that (1) his convictions must be reversed because the trial court improperly joined the murder and attempted robbery charges with the other charges against him, and tried him with the other defendants; and (2) his conviction for possession of a firearm by a felon should be reversed because the trial court improperly permitted the prosecution to amend the information to add that charge on the first day of trial despite the fact that the evidence presented at the preliminary hearing did not support the charge.

---

[4] On the People's motion, the court dismissed counts 1 and 2 as to Vargas and Herrera pursuant to their plea bargains.

4

Vargas contends that trial court erred by imposing an aggravated 11-year prison term for her voluntary manslaughter conviction rather than the six-year midterm. We affirm the judgments.

## II.

## FACTS

A.    *Unlawful Driving or Taking of a Vehicle and Receiving Stolen Property (Counts 4 and 5)*

Darren Cooley was sitting in his 2002 GMC Sonoma pickup truck in the carport of his residence on January 18, 2011 when two men approached him from behind. One of the men was about six feet two inches tall and weighed about 240 pounds; the other was about five feet eight inches tall and weighed about 170 pounds. Both men were wearing hoodies and bandanas that covered their faces from the bridge of the nose down. The taller man told Cooley to give him the keys to the truck and the shorter man said that if Cooley did not give them the keys, they would take the truck another way. The shorter man then lifted the right side of his sweatshirt to show Cooley what appeared to be the butt of a gun.

Cooley testified that he started to hand over his keys, but "kind of stumbled with the keys." The taller man grabbed the keys as they were falling out of Cooley's hand. Cooley testified, "Once they grabbed the keys, I locked the door and turned the alarm on to my house." Fontana police recovered his vehicle and returned it to him. On cross-

5

examination, Cooley denied that the "story about [his] car being taken [was] utter nonsense," and further denied that his vehicle was taken as payment for drugs.

In January 2011, when Penix and Long were both living with Penix's grandmother, Helen Penix,[5] Helen saw Long in possession of an old white GMC truck. Renee Farias, who also lived on Helen's property, testified that Long told her that he had taken the truck from someone who owed him money. Farias had seen a metallic black revolver in Long's possession numerous times prior to January 27, 2011, the day of the murder and attempted robbery that Long and the other defendants were charged with in this case. On that day, a Fontana police officer stopped Long while Long was driving the truck and arrested him based on information that the officer had received about the truck being stolen. The officer found a GMC key in the ignition of the truck and a key chain with three shaved keys on it. The officer testified that "[s]haved keys are where you have a regular key and you shave [it] down, so you don't have as many grooves as a normal key has and that helps suspects . . . to bypass vehicle ignitions."

B.    *Possession of a Firearm by a Felon as to Long (Count 3)*

Helen testified that on January 27, 2011, she saw Long, Penix, and Farias leave her property in the white pickup that Long had recently acquired. Long was driving the truck. Farias testified that on the same day, she heard Penix and Long talking about going to Fontana. Long said that they were going to meet up with some girls there who

---

5    We will refer to Helen Penix by her first name to avoid confusion, intending no disrespect. Helen testified, "I'm [Penix's] grandmother, but I've been his mom and dad for the majority of his life." Penix referred to Helen as his mother.

"could set up guys to rob them." Penix agreed to accompany Long. Farias testified that Long and Penix invited her to go with them, but she declined. She saw Long holding a metallic black revolver that she had seen in his possession numerous times prior to that day. Long was inside Helen's house when Farias saw him with the gun. Farias saw him put the gun in his jacket pocket and get into the truck.

In a recorded police interview that was played for the jury, Penix said to the detective, "Look, the gun was brought, the gun was inside the truck in the engine compartment, ok. When we got there, I lifted up the hood and I grabbed the gun, ok. We brought the gun [into the motel room where the homicide occurred], ok." The detective asked, "Who's we?" Penix replied, "Me and [Long] brought that fucking gun in that goddamn [*sic*] room alright. OK, I did not carry the gun into room 215 in my waistband. Me and [Long] brought that goddamn gun up in there, ok. I told him we don't need no goddamn gun."

C.    *Felony Murder and Attempted Robbery (Counts 1 and 2)*

Vargas testified that she and her best friend Herrera had been engaging in prostitution off and on for approximately six years. Sometimes they performed sexual acts in exchange for money, and sometimes they would tell a person who solicited sex that they were underage and then threaten to call the police unless the person did what they wanted. Vargas testified that for a number of years, she had been "rolling pisas,"

which meant that she had participated in robbing Mexican nationals who sought her sexual services.[6]

Sometime between 6:00 and 7:00 p.m. on January 27, 2011, Vargas and Herrera were at a tattoo shop in Fontana "trying to get a motel room because [they] didn't have anywhere to go for the night." As Carlos Pineda was passing by the shop on his bicycle, Vargas approached him and told him that she and Herrera were looking for a place to stay for the night. Pineda agreed to rent a motel room and Vargas and Herrera agreed to perform "sexual favors" for Pineda in exchange.

Vargas, Herrera, and Pineda walked to the Valley Motel, which was next to the tattoo shop, and Vargas went with Pineda to the motel office to check in. Vargas registered as "Monique Lopez" and Pineda paid for the room. Vargas, Herrera, and Pineda went to the motel room. About 15 minutes later, Pineda and Vargas walked to a nearby liquor store, where Pineda purchased "hygienes," condoms, and lottery tickets. When they returned to the motel room, Vargas and Herrera took showers.

After Herrera showered, Vargas shared some crystal methamphetamine (meth) with Pineda and then asked him whether he wanted to buy more drugs. Pineda said that he had about $50 to spend on drugs and the three agreed that he would buy some more meth. After calling a couple of friends who dealt drugs but were "not around," Vargas

_____

6      Vargas explained that the term "pisa" is a derogatory term for "Mexican guys who come from Mexico."

8

called Penix and asked him if he could deliver $50 worth of meth. Penix said that he could.

Penix and Long arrived at the motel in the stolen truck, with the drugs. Penix was wearing a cast on his right arm because he had recently broken some bones in his right hand in a motorcycle accident. Penix lifted the hood, removed a handgun from the truck's engine compartment and put it in his pocket before entering the motel room. Pineda said that he did not have enough money to pay for the drugs and reluctantly agreed to accompany Penix and Long to an ATM to get more cash. The three men returned to the motel room about five minutes after they had left to go to the ATM, and Pineda gave Long money for the drugs.

Long and Vargas left the motel to buy a pipe to use to smoke meth. Pineda took a shower while they were gone. Herrera testified that while Pineda was in the shower, Penix rummaged through his backpack but did not take anything from it. Penix also "wiped [a] chair down" with a bandana while Pineda was showering and told Herrera to help him unplug the telephone. Penix was struggling to reach the telephone plug, which was behind the bed, but Herrera was able to reach it and unplug the phone. Penix wore a coat the entire time he was in the motel room.

Long and Vargas returned to the motel room with the pipe and smoked meth with Penix and Herrera. Pineda snorted lines of meth. Everyone was talking, watching pornography on the television, and "getting along." About 15 minutes after Long and Vargas returned to the room, Long got up to leave, saying that he had to drop off some

9

drugs. He asked Herrera whether she wanted to come along for the ride and she agreed to go with him. Herrera rode in the truck with Long to a house in Fontana where Long picked up a male friend and then drove to the Sky View Motel, which was a mile or two from the Valley Motel. When the three arrived at the motel, police stopped the truck and arrested Long because he was driving a stolen vehicle. The police allowed Herrera to leave, and she started walking back to the Valley Motel.

After approximately 35 minutes had passed since Long and Herrera left the motel room, Penix became worried and called Long's cell phone several times. The calls went straight to voicemail. Penix then sat next to Vargas on one of the beds and whispered that he had obtained the PIN (personal identification number) to Pineda's credit card when he watched Pineda withdraw money from the ATM machine. A few minutes later, Vargas went into the bathroom. When she came out of the bathroom, Penix was standing out of Pineda's view, holding a gun in his hand. While Vargas was in the bathroom, Penix had put a beige glove on his hand that did not have the cast on it. The television was still on at a loud volume. Penix said to Vargas at a "normal" volume, "I'm going to come up on him." Vargas understood Penix's statement to mean that Penix was going to "take [Pineda] for what he has"—i.e., take "his money." She later testified that before Penix shot Pineda, he told her "[t]hat he was going to rob him."

Vargas testified that Penix walked over to Pineda, pointed the gun at him, and told him to turn over onto his stomach. Vargas translated Penix's command because Pineda did not speak much English. She told Pineda in Spanish to calm down and turn over.

10

Instead of turning over, Pineda stood up on the bed, raised his hands in the air and started walking toward the foot of the bed in Penix's direction. He said that he had no money. Penix walked backward with the gun pointed at Pineda as Pineda got off of the bed and continued to walk toward Penix until Penix was cornered and could not back up any farther. Penix told Pineda to get back, but Pineda walked up to him and reached for the gun. Pineda put his hand on the gun and the gun fired. A single shot entered Pineda's chest and went through his heart and lungs, causing his death within minutes. The forensic pathologist who performed an autopsy on Pineda testified that the gun barrel was nine to 15 inches away from Pineda when the shot was fired.

During a police interview, Vargas told a detective that Penix went through Pineda's pockets after he shot Pineda. At trial, Vargas denied that Penix had gone through Pineda's pockets and said that she had lied when she told the detective that he had. Vargas testified that she turned and ran out of the room and down the street immediately after Pineda was shot, while he was still standing. Penix quickly caught up with her and they ran together toward a convenience store. Vargas saw Penix take the cast off his arm and crush a cell phone.

As Vargas and Penix ran down the street, they encountered Herrera. Herrera testified that while she was walking back to the Valley Motel after Long's arrest, she saw Vargas and Penix "racing toward" her. Vargas told Herrera what had happened. Herrera and Vargas sat on a curb and Herrera tried to calm Vargas down "because she was really shocked." Vargas and Herrera left together and Penix went his own way. Sometime after

11

the incident, Penix put the cast that had been on his arm, a jacket, and some other items in a barrel on his grandmother's property and set them on fire.

III.

DISCUSSION

*PENIX'S APPEAL*

A.      *Failure to Instruct on Attempted Theft as a Lesser Included Offense*

Penix contends that his convictions for both attempted robbery and murder must be reversed because the trial court did not instruct the jury on the lesser included offense of attempted theft, which is not one of the predicate offenses specified in section 189, California's felony murder statute.[7] (*People v. Ledesma* (2006) 39 Cal.4th 641, 715 ["Theft is a necessarily included offense of robbery"].)

" 'California law requires a trial court, sua sponte, to instruct fully on all lesser necessarily included offenses supported by the evidence.' [Citation.]  The trial court has no obligation to instruct on theories not supported, or only weakly supported by the evidence; however, 'instructions are required whenever evidence that the defendant is guilty only of the lesser offense is "substantial enough to merit consideration" by the jury. [Citations.]  "Substantial evidence" in this context is " 'evidence from which a jury composed of reasonable [persons] could . . . conclude[]' " that the lesser offense, but not

---

7      The predicate offenses for felony first degree murder specified in section 189 include "the perpetration of, or attempt to perpetrate, arson, rape, carjacking, robbery, burglary, mayhem, kidnapping, train wrecking, or any act punishable under [s]ection 206, 286, 288, 288a or 289 . . . ."

12

the greater, was committed.' " (*People v. Reeves* (2001) 91 Cal.App.4th 14, 51, citing

*People v. Breverman* (1998) 19 Cal.4th 142, 148-149, 162 (*Breverman*).)

We independently review whether the trial court failed to instruct on a lesser

included offense. (*People v. Verdugo* (2010) 50 Cal.4th 263, 293.) The California

Supreme Court in *Breverman* held that the *Watson*[8] standard of reversal applies to error

in failing to instruct sua sponte on a lesser included offense, stating that "[a] conviction of

the charged offense may be reversed in consequence of this form of error only if, 'after an

examination of the entire cause, including the evidence' [citation], it appears 'reasonably

probable' the defendant would have obtained a more favorable outcome had the error not

occurred [citation]." (*Breverman, supra,* 19 Cal.4th at p. 178, citing Cal. Const., art. VI,

§ 13, and *People v. Watson, supra,* 46 Cal.2d at p. 836.)

Penix argues that there was sufficient evidence to require an instruction on

attempted theft. Specifically, he cites the evidence that he went through Pineda's bag

while Pineda was in the shower, and his statements during his police interview that he did

not go to the motel room with the intent to rob Pineda and that he did not attempt to rob

Pineda. Penix told the detective that Pineda became angry and rushed him when Penix

asked for money to get home, and that the gun fired when Pineda "went for [it]."

Assuming that this evidence triggered the trial court's duty to instruct the jury sua

sponte on attempted theft, we conclude that Penix was not prejudiced by the court's

---

8    *People v. Watson* (1956) 46 Cal.2d 818, 836.

failure to give the instruction. "[T]he *Watson* test for harmless error 'focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.' [Citations.]" (*People v. Beltran* (2013) 56 Cal.4th 935, 956.)

The evidence that Penix committed an attempted theft, and not an attempted robbery, is weak and insubstantial in comparison to the evidence that Penix committed an attempted robbery. Farias testified that on the day of the incident, she heard Long say that he and Penix were going to meet some girls in Fontana who "could set up guys to rob them." She saw Long holding a revolver and saw him leave the house with the gun and get into the truck. Vargas testified that for a number of years, she had been "rolling pisas."

When Penix and Long arrived at the Valley Motel in the stolen truck, Penix removed a handgun from the truck's engine compartment and put it in his pocket before entering the motel room. After Long and Herrera had left the room and Pineda was in the shower, Penix went through Pineda's backpack, wiped a chair with a bandana, and ordered Herrera to help him unplug the telephone. Penix later whispered to Vargas that he had Pineda's PIN, indicating that he intended to steal Pineda's debit or credit card. Vargas testified that when she came out of the bathroom, Penix was holding a gun. He

14

told her that he was going to "come up on" (i.e., rob) Pineda. Penix then ordered Pineda to turn over onto his stomach on the bed. Vargas told the police that after Penix shot Pineda, he went through Pineda's pockets.

This evidence strongly supports the jury's finding that Penix committed attempted robbery. The jury could reasonably infer from Vargas's testimony about "rolling pisas" and Farias's testimony that Penix and Long talked about meeting girls in Fontana who "could set up guys to rob them" that Penix and Long went to the Valley Motel with the intent to commit a robbery. Vargas's testimony that Penix wiped furniture and directed her to unplug the telephone while Pineda was in the shower further supports the inference that Penix intended to rob Pineda after he came out of the bathroom. The jury could reasonably infer from the evidence that Penix went through Pineda's backpack and took nothing from it, and later told Vargas that he had Pineda's PIN, that Penix wanted to steal Pineda's ATM card and that he intended use the gun to rob Pineda of the card after he failed to find the card in Pineda's backpack. The sole reasonable inference from Vargas's testimony that Penix told her he intended to rob Pineda moments before he pointed the gun at Pineda and ordered him to turn over onto his stomach on the bed is that Penix attempted to rob Pineda before Pineda resisted and reached for the gun. The evidence that Penix went through Pineda's pockets after he shot Pineda further supports the finding that Penix had intended to rob Pineda of his ATM card or cash.

Penix's self-serving denial during a police interview that he intended to commit a robbery was overwhelmingly outweighed by the evidence that he attempted to rob

15

Pineda. Penix substantially changed his story as the police interview progressed. He initially stated that Vargas shot Pineda while Penix was in the bathroom and that he did not shoot or threaten anyone. He later said that the gun was not in his possession but was on a table in the motel room, and that Vargas "had a pistol." At one point he said that Pineda put the gun on the table and asked Penix if he knew anyone who wanted to buy it. He claimed that he asked Vargas to ask Pineda (in Spanish) if Pineda would give him some money so that he could get a taxi to take him home, and that when Vargas related his request to Pineda, Pineda got "all crazy" with Vargas, rushed Penix, and went for the gun on the table. Penix said that he also lunged for gun and that the gun went off as he and Pineda "fought over [it]." Penix admitted that he ran out of the room with the gun and "threw it." He later told the detective that Vargas had "said something about getting this fool's money," and that he wiped off the area in the room where he had been sitting. He eventually admitted that Herrera had unplugged the telephone and that there was a plan to trap Pineda, stating, "I didn't know we were going at a trap until a little while later and then they put the gun on the table . . . ." After repeatedly denying that he had possessed the gun or brought the gun into the motel room, Penix ultimately admitted that the gun had been inside the truck engine compartment and that he removed it from there before entering the motel room. He said that "Homeboy [Long] asked [him] to hold the motherfucking gun while he went and got some dope and come back . . . ."

Penix's statement to the detective that Pineda "got crazy" when Penix simply asked him for $20 to get back home is inconsistent with the evidence that Penix and Pineda and

16

the rest of the group had all been "getting along" and using drugs, talking, and laughing together. The far more reasonable inference from the evidence is that Pineda "got crazy" because Penix pointed the gun at him and attempted to rob him. To the extent that Penix's act of rummaging through Pineda's backpack while Pineda was in the shower evidences an attempted theft, it was a separate uncharged offense rather than a lesser included offense of the charged attempted robbery that occurred when Pineda returned to the room after showering. Given the overwhelming strength of the robbery evidence in comparison to the evidence that Penix attempted only a theft, it is not reasonably probably that Penix would have obtained a more favorable outcome if the court had given the jury an attempted theft instruction.

B.  *Failure to Instruct on Second Degree Murder and Voluntary Manslaughter as Lesser Included Offenses of First Degree Murder*

The amended information alleged that Penix and the other defendants "did unlawfully, and with malice aforethought murder . . . Pineda." However, despite the information's allegation of malice murder, the prosecution's sole theory of murder at trial was felony murder. Because the prosecution proceeded solely on a theory of felony murder, the court denied Penix's request to instruct the jury on second degree murder and voluntary manslaughter as lesser included offenses of first degree murder. Penix contends that the court's failure to instruct on second degree murder and voluntary manslaughter as lesser included offenses was prejudicial error under *People v. Banks* (2014) 59 Cal.4th 1113 (*Banks*) because the information alleged malice murder and there

17

was substantial evidence to warrant the instructions.  The People concede that the court erred by not instructing on second degree murder and voluntary manslaughter as lesser included offenses, but argue that the error was harmless.

In *Banks,* an indictment alleged that the defendant murdered a victim with malice aforethought, and further alleged that the murder occurred while the defendant was committing an attempted robbery.  (*Banks*, *supra*, 59 Cal.4th at p. 1156.)  At trial, the prosecution proceeded on a felony murder theory only.  (*Ibid.*)  The *Banks* court reaffirmed that " '[f]or purposes of determining a trial court's instructional duties, . . . a lesser offense is necessarily included in a greater offense if either the statutory elements of the greater offense, *or the facts actually alleged in the accusatory pleading*, include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser." '  [Citation.]  When applying the accusatory pleading test, '[t]he trial court need only examine the accusatory pleading.'  [Citation.]  '[S]o long as the prosecution has chosen to allege a way of committing the greater offense that necessarily subsumes a lesser offense, and so long as there is substantial evidence that the defendant committed the lesser offense without also committing the greater, the trial court must instruct on the lesser included offense.' "  (*Id.* at p. 1160.)  The *Banks* court concluded that the trial court should have instructed the jury on second degree murder because "under the accusatory pleading test, second degree murder was plainly a lesser included offense of felony murder *as charged*" (*ibid.*), and there was sufficient evidence to support a finding of second degree murder.  (*Id.* at pp. 1160-1161.)

18

We conclude that the trial court's failure to instruct on second degree murder and voluntary manslaughter was harmless error.  As we discussed above, the *Watson* standard of reversal applies to error in failing to sua sponte instruct on a lesser included offense. (*Breverman, supra,* 19 Cal.4th at p. 178.)  Penix cites *People v. Thomas* (2013) 218 Cal.App.4th 630, 633 (*Thomas*) as authority for the proposition that error in failing to instruct on voluntary manslaughter is properly reviewed under the more stringent *Chapman*[9] standard, which requires reversal unless the reviewing court determines that the error was harmless beyond a reasonable doubt.[10]  We conclude that the court's failure to instruct on second degree murder and voluntary manslaughter was harmless under either standard.

---

[9]     *Chapman v. California* (1976) 386 U.S. 18, 24.

[10]     Error is harmless beyond a reasonable doubt when there is no " 'reasonable possibility that the [error] complained of might have contributed to the conviction.' " (*Chapman v. California, supra,* 386 U.S. at p. 24.)  The *Thomas* court held that failure to instruct on heat of passion voluntary manslaughter as a lesser included offense of murder is federal constitutional error because heat of passion negates malice, malice is a necessary element of murder, and, therefore, failure to instruct on heat of passion unconstitutionally reduces the prosecution's burden of proving every element of the charged crime.  (*Thomas, supra,* 218 Cal.App.4th at pp. 643-644.)  Under this reasoning, failure to instruct on an unreasonable self-defense or unreasonable defense of another theory of voluntary manslaughter would also be federal constitutional error because those theories also negate malice.  However, the California Supreme Court has held that failure to instruct on unreasonable self-defense or defense of another is an error of state law to which the *Watson* standard applies.  (*People v. Blakeley* (2000) 23 Cal.4th 82, 93-94 [imperfect self-defense]; *People v. Randle* (2005) 35 Cal.4th 987, 1003 [imperfect defense of another], overruled on another point in *People v. Chun* (2009) 45 Cal.4th 1172, 1200-1201.)

The trial court instructed the jury that to convict Penix of felony murder, it had to find that Penix intended and attempted to commit a robbery, and that he caused Pineda's death while attempting the robbery. The court further instructed: "To decide whether the defendant attempted to commit robbery please refer to the separate instructions that I will give you on that crime. *You must apply those instructions when you decide whether the People have proved first degree murder under a theory of felony murder.*" (Italics added.) Thus, the jury was instructed to determine whether Penix committed an attempted robbery before considering whether he was guilty of felony murder. "The crucial assumption underlying our constitutional system of trial by jury is that jurors generally understand and faithfully follow instructions." (*People v. Mickey* (1991) 54 Cal.3d 612, 689, fn. 17.)

Regarding attempted robbery, the jury was instructed that it had to find that the defendant "used force or fear to attempt to take the property [that was not his own] or to prevent the [victim] from resisting"; that "[w]hen the defendant used force or fear to attempt to take the property, the defendant intended to deprive the owner of it permanently"; and that "[t]he defendant's intent to take the property must have been formed before or during the time the defendant used force or fear." Thus, the jury found, beyond a reasonable doubt, that Penix shot Pineda during an attempted robbery—i.e., that Penix had the intent to rob Pineda when the gun fired and caused Pineda's death. As we discussed above, the evidence overwhelmingly supports the jury's finding that Penix killed Pineda while attempting to rob him. Considering that finding and the weight of the

20

evidence supporting it, we conclude that it is not reasonably possible that the jury would have convicted Penix of second degree murder or voluntary manslaughter rather than first degree felony murder if the court had instructed the jury on those lesser included offenses.

*LONG'S APPEAL*

A.. *Joinder of Offenses*

Long contends that the trial court prejudicially erred in joining the murder and attempted robbery charges with the other charges against him. We agree that the court erred in joining the offenses, but conclude that the error was harmless.

The People filed an amended felony complaint against Long on February 4, 2011 alleging one count of unlawfully driving or taking of a vehicle, one count of receiving stolen property (a motor vehicle), and one count of possessing burglar's tools.[11] On the People's motion, the court ordered that case consolidated with the case charging Long, Penix, Vargas, and Herrera with murder and attempted robbery. After the cases were consolidated, the People filed an amended information that included the offenses charged in both cases.

Under section 954, "[a]n accusatory pleading may charge two or more different offenses connected together in their commission, . . . or two or more different offenses of the same class of crimes or offenses, under separate counts, and if two or more accusatory pleadings are filed in such cases in the same court, the court may order them

---

[11]   The count of possessing burglar's tools was dismissed before trial.

21

to be consolidated. . . . [T]he defendant may be convicted of any number of the offenses charged . . . provided, that the court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately or divided into two or more groups and each of said groups tried separately."

"For purposes of joinder, offenses are deemed to have been 'connected together in their commission' where there was a common element of substantial importance in their commission, even though the offenses charged did not relate to the same transaction and were committed at different times and places and against different victims. [Citations.] Similarly, within the meaning of section 954, offenses are 'of the same class' if they possess common characteristics or attributes." (*Aydelott v. Superior Court* (1970) 7 Cal.App.3d 718, 722; *People v. Lucky* (1988) 45 Cal.3d 259, 276.) Consolidation or joinder is generally preferred by the law because it promotes efficiency. (*People v. Hartsch* (2010) 49 Cal.4th 472, 493.)

In granting the People's motion to consolidate, the court found that the offenses against Long pertaining to the stolen vehicle were not of the same class as the murder and attempted robbery charged in the second case, but were "connected in their commission." The court reasoned that the offenses were connected because Long was arrested in the stolen vehicle that transported the gun used in the attempted robbery and, in the court's words, "there is clearly going to be cross-admissibility of evidence, which generally tends to be the most significant criteri[on] that you use in deciding whether or not to

22

consolidate cases." The court concluded, "So, as I put all of this together and look at the preference that there is for consolidation and look particularly at the cross-admissibility of evidence and the fact that you have offenses that are clearly connected in a commission, I do believe it's appropriate to consolidate so I will consolidate."

Long argues that neither the fact that the stolen vehicle was a common element in the two cases nor the cross-admissibility of evidence supported consolidation or joinder in this case. We agree. As noted, offenses that are "committed at different times and places against different victims are nevertheless 'connected together in their commission' when they are . . . linked by a ' "common element of *substantial importance*.' " (*People v. Lucky, supra,* 45 Cal.3d at p. 276, italics added.) The trial court viewed the stolen truck as the common element that connected the consolidated cases. The fact that on the day of the murder, Long was arrested in the stolen truck that he and Penix had driven to the scene of the murder does not make the truck a common element of substantial importance. The mode of transportation that Penix and Long used to get to the scene of the attempted robbery and murder and related locations, such as the ATM where Pineda obtained cash, is irrelevant to the proof of those offenses, as is the fact that Long was later arrested for stealing the truck around the time that the murder and attempted robbery were taking place at a different location.[12] In a hypothetical separate trial of the murder

---

12    The People argue that possession of the gun was also a common and important element of each case and state that "[t]he truck was originally stolen at gunpoint." However, Cooley, the victim of the truck theft, did not testify that the truck was stolen at gunpoint; he testified that the shorter of the two perpetrators lifted the right side of his

23

and attempted robbery charges, evidence that Long was arrested for stealing the truck after he and Herrera left the Valley Motel to deliver drugs would likely be ruled inadmissible as irrelevant or as unduly prejudicial under Evidence Code section 352. Because the vehicle theft offenses and the attempted robbery and murder were not connected together in their commission by a common element of substantial importance and were not of the same class of offenses, as the trial court acknowledged, the court improperly consolidated the two cases for trial.

Although the cases did not meet the statutory criteria for consolidation, we conclude that the consolidation was harmless. Where two cases are erroneously consolidated for trial, "a reversal will not be had unless there is such a miscarriage of justice as would violate article VI," section 13, of the California Constitution. (*People v. Saldana* (1965) 233 Cal.App.2d 24, 30-31; see *United States v. Lane* (1986) 474 U.S. 438, 446, fn. 8 ["[M]isjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial"].) "[A] 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is

---

sweatshirt and showed Cooley what appeared to be the butt of a gun. Because it was not established at trial that Long was the shorter or taller perpetrator, the record does not show that the gun was a common element of the two cases. The People did not argue that the gun was a common element of substantial importance in their motion to consolidate the two cases, and did not charge Long with robbery in connection with the stealing of the truck or with carjacking by means of force or fear under section 215.

24

reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson, supra,* 46 Cal.2d at p. 836.)

In his opposition to the People's motion to consolidate the two cases, Long argued that "[a]llowing both cases to be heard together [would] substantially prejudice Mr. Long *in his murder case*, the far more serious case." (Italics added.) On appeal, Long argues that the consolidation prejudiced him on the less serious charges of unlawful driving or taking of a vehicle and receiving stolen property. The fact that the jury acquitted Long of the murder and attempted robbery charges establishes that the prejudice he predicted in his opposition to the motion to consolidate did not occur. The acquittals strongly indicate that the consolidation of the charges did not inflame the jury, but rather, that the jury was able to dispassionately weigh the evidence and determine whether it supported findings of guilt beyond a reasonable doubt as to each of the charges against Long. Substantial evidence supports Long's convictions for unlawful driving or taking of a vehicle, and receiving stolen property, including the fact that when he was stopped and arrested for driving the stolen truck, he had a key chain with three shaved keys on it.[13] We see no

---

13      In arguing that there was overwhelming evidence that Long drove a stolen vehicle, the People assert that "[m]ultiple witnesses testified that Long admitted stealing the vehicle." In fact, there was no testimony at trial that Long actually admitted that he stole the vehicle. Farias testified that Long said that he "took" the truck from someone who owed him money, but she said that she did not recall whether Long had explained *how* he took the truck. Herrera testified that when she was with Long in the truck on the day of the murder and he was stopped by the police, Long told her that the truck was stolen. Herrera did not testify that Long told her that *he* stole the truck. In any event, the evidence, including Farias's and Herrera's testimony, sufficiently supports Long's convictions for unlawful driving or taking of a vehicle, and receiving stolen property.

reason to conclude that the joinder of the more serious charges of which Long was acquitted with the less serious charges rendered him more likely to be convicted of the less serious charges than he would have been in a separate trial on those charges. Because it is not reasonably probable that Long would have obtained a more favorable outcome on the less serious charges if the court had denied the People's motion to consolidate, the consolidation did not violate Long's constitutional right to a fair trial.

B. *Joinder of Defendants*

Long additionally argues that the trial court prejudicially erred in joining his trial with that of the other defendants who allegedly were involved in the murder and attempted robbery. Long offers little argument on this point except to assert that he was "clearly prejudiced by his association with the remaining defendants, and by the significant and unflattering evidence adduced against them." Although Long opposed consolidation of the vehicle theft case against him with the murder/attempted robbery case, the record does not reflect that he moved for severance from the other defendants and a separate trial. Consequently, his argument that the court erred in trying him with the other defendants is forfeited. (*People v. Cornejo* (1979) 92 Cal.App.3d 637, 659 ["Because appellant did not move for severance in the trial court, he waived his right to do so and may not, for the first time on appeal, contend that a severance should have been granted"].) In any event, the fact that the jury acquitted Long of murder and attempted robbery despite his association with the other defendants belies his claim that he was

26

prejudiced by that association.  The joinder of offenses and parties in this case did not prejudice Long.

C.      *Amendment of Information To Add Charge of Possession of a Firearm by a Felon*

Long contends that his conviction for possession of a firearm by a felon should be reversed because the trial court improperly permitted the prosecution to amend the information to add that charge on the first day of trial.  Long argues that the amendment was improper because the evidence presented at the preliminary hearing did not support the charge.

Section 1009 provides that "[a]n indictment or accusation cannot be amended so as to change the offense charged, nor an information so as to charge an offense not shown by the evidence taken at the preliminary examination."  On the first day of trial, the prosecution sought to amend the information by adding Long as a defendant to count 3, possession of a firearm by a felon.  Long's counsel objected to the proposed amendment on the ground that there was nothing in the preliminary hearing transcript that indicated that Long had been in actual or constructive possession of the handgun that was the basis of the charge.

After a meeting between the court and counsel in the court's chambers during which the prosecutor read portions of the preliminary hearing transcript to the court, the court decided to allow the amendment based on portions of the transcript that showed that Penix retrieved the gun from the engine compartment of the vehicle that Long drove and that Long was "being charged for essentially stealing that vehicle."  The court stated,

27

"And I believe that is constructive possession sufficient enough to charge both [Penix and Long] with possession of a firearm by a felon."

We conclude that there was sufficient evidence presented at the preliminary hearing of Long's constructive possession of the gun to allow amendment of the information under section 1009 to add the firearm possession charge against Long. Section 29800, subdivision (a)(1) (formerly § 12021, subd. (a)) provides, in relevant part: "Any person who has been convicted of a felony under the laws of the United States, the State of California, or any other state, government, or country . . . and who owns, purchases, receives, or has in possession *or under custody or control* any firearm is guilty of a felony."  (Italics added.)

" 'A defendant possesses a weapon when it is under his dominion and control. [Citation.]  A defendant has actual possession when the weapon is in his immediate possession or control.  He has *constructive possession* when the weapon, while not in his actual possession, is nonetheless under his dominion and control, either directly or through others.  [Citations.]'  [Citation.]  'Implicitly, the crime is committed the instant the felon in any way has a firearm within his control.'  [Citation.]  [¶]  A firearm can be under a person's dominion and control without it being available for use.  For example, suppose a parolee's residence (in which only he lives) is searched and a firearm is found next to his bed.  The parolee is in possession of the firearm, because it is under his dominion and control.  If he is not home at the time, however, he is not armed with the firearm, because it is not readily available to him for offensive or defensive use.

28

Accordingly, possessing a firearm does not necessarily constitute being armed with a firearm."  (*People v. Blakely* (2014) 225 Cal.App.4th 1042, 1052, italics added.)

"[U]nlawful possession may be established by circumstantial evidence and any reasonable inferences drawn from such evidence."  (*People v. Williams* (1971) 5 Cal.3d 211, 215 [addressing illegal possession of restricted dangerous drugs]; see *People v. Cordova* (1979) 97 Cal.App.3d 665, 669 [circumstantial evidence was sufficient to support a finding that defendant was in constructive possession of firearm found in locked trunk of defendant's father's car that defendant had driven].)  "A violation of [former] section 12021, subdivision (a) is a relatively simple crime to commit: an ex-felon who owns, possesses, or has custody or control of a firearm commits a felony. *Implicitly, the crime is committed the instant the felon in any way has a firearm within his control.*"  (*People v. Ratcliff* (1990) 223 Cal.App.3d 1401, 1410, fn. omitted.)

The trial court reasonably found that the preliminary hearing evidence showed that Long constructively possessed the gun that Penix used to shoot Pineda.  The detective who questioned Penix testified that Penix told him that the gun was "in the vehicle that Mr. Long was in"—i.e., the truck that Long and Penix drove to the Valley Motel.  Penix told the detective that he removed the gun from the truck's engine compartment.  The preliminary hearing transcript does not include testimony that directly establishes that Penix and Long were friends and roommates; however, those facts were undisputed.  Because Long possessed the stolen truck, it is reasonable to infer that he knew the gun was in the engine compartment, either because he put it there or because he was aware

29

that Penix put it there. The court could reasonably infer that it was unlikely that Penix placed the gun in the engine compartment without the knowledge of his friend and roommate who, from Penix's point of view, owned the truck. Accordingly, the court could reasonably conclude that the evidence showed that Long constructively possessed the gun—i.e., that the gun was " 'under his dominion and control, either directly or through [Penix].' " (*People v. Blakely, supra,* 225 Cal.App.4th at p. 1052.) The court did not err in allowing the prosecution to amend the information at trial to charge Long with possession of a firearm by a felon.

*VARGAS'S APPEAL*

A.    *Sentence on Voluntary Manslaughter Conviction*

Vargas contends that trial court erred by imposing an aggravated 11-year prison term for her voluntary manslaughter conviction rather than the six-year midterm. As noted, Vargas pleaded guilty to second degree murder and agreed to cooperate with the prosecution by testifying against Penix and Long. As part of her plea bargain, she would be entitled to withdraw her guilty plea to second degree murder and enter a new plea of guilty to voluntary manslaughter, with a maximum sentence of 11 years in prison, if the court determined that she cooperated with the prosecution and testified truthfully at trial.

At Vargas's sentencing hearing, the court heard argument from the prosecutor and Vargas's counsel on the issue of whether Vargas had testified truthfully at trial. The prosecutor argued that Vargas's "testimony in different points of the trial was dishonest." The court stated to Vargas, "I have more concern about your truthfulness or lack thereof

30

than I have regarding Ms. Herrera, and I've struggled with this enormously in my mind the last couple of months." The court expressed concerns about Vargas's credibility, including discrepancies between her statements to the police and her trial testimony regarding the disposal of the gun that Penix used to shoot Pineda. However, the court declined to make a finding that Vargas had given false testimony, stating:

> "So what I'm going to do is not . . . make the conclusion that you lied on the stand, but as opposed to Ms. Herrera, who wasn't there when the murder was committed, Ms. Vargas, you are significantly more involved in my mind as a perpetrator remembering there is something called felony murder in this whole situation regarding this victim. You were in the room when he died, you were the interpreter, so to speak, for him. He went ahead as a result of something you obviously said to him because you spoke Spanish and Penix didn't, he ends up doing somewhat of an illogical thing when he's got a gun pointed at him and he stands up and basically charges . . . Mr. Penix the shooter. So as opposed to Ms. Herrera, you're into this a lot deeper than she is, which is why you're getting a different sentence. Not only were you there, but I am convinced that your actions played a role in what happened to this poor man."

The court allowed Vargas to withdraw her guilty plea to second degree murder and plead guilty to voluntary manslaughter. The then court asked Vargas's counsel if he waived arraignment for pronouncement of judgment and sentence, and asked, "[N]o legal cause [why judgment should not be pronounced]?" Counsel responded, "Yes, no legal cause." The court stated that it would "make no findings under rules 413, 414, 421, and 423," and then immediately pronounced sentence, which included the aggravated prison term of 11 years. Vargas contends that the imposition of the 11-year upper term rather than the six-year midterm was arbitrary and unwarranted.

31

The People maintain that Vargas forfeited her challenge to the sentence under *People v. Scott* (1994) 9 Cal.4th 331 (*Scott*) by failing to object to it at sentencing. "In *Scott*, [the California Supreme Court] prospectively announced a new rule: A party in a criminal case may not, on appeal, raise 'claims involving the trial court's failure to properly make or articulate its discretionary sentencing choices' if the party did not object to the sentence at trial. [Citation.] The rule applies to 'cases in which . . . the court purportedly erred because it . . . misweighed the various factors, or failed to state any reasons or give a sufficient number of valid reasons' [citation], but the rule does not apply when the sentence is legally unauthorized [citation]." (*People v. Gonzalez* (2003) 31 Cal.4th 745, 751.) "But *Scott* went on to say: '[T]here must be a *meaningful opportunity* to object to the kinds of claims otherwise deemed waived by [the *Scott*] decision.' [Citation.] 'This opportunity can occur,' *Scott* observed, 'only if, during the course of the sentencing hearing itself and before objections are made, the parties are clearly apprised of the sentence the court intends to impose and the reasons that support any discretionary choices.' " (*People v. Gonzalez, supra,* at p. 751.)

"[T]he *Scott* rule applies when the trial court 'clearly apprise[s]' the parties 'of the sentence the court intends to impose and the reasons that support any discretionary choices' [citation], and gives the parties a chance to seek 'clarification or change' [citation] by objecting to errors in the sentence. The parties are given an adequate opportunity to seek such clarifications or changes if, at *any time* during the sentencing hearing, the trial court describes the sentence it intends to impose and the reasons for the

32

sentence, and the court thereafter considers the objections of the parties *before the actual sentencing*. The court need not expressly describe its proposed sentence as 'tentative' so long as it demonstrates a willingness to consider such objections. If the court, after listening to the parties' objections, concludes that its proposed sentence is legally sound, it may simply state that it is imposing the sentence it has just described, without reiterating the particulars of that sentence. By contrast, if the trial court finds that one of the parties has raised a meritorious objection to the proposed sentence, it should alter its sentence accordingly. [¶] It is only if the trial court fails to give the parties any meaningful opportunity to object that the *Scott* rule becomes inapplicable." (*People v. Gonzalez, supra,* 31 Cal.4th at p. 752, second italics added.)

In the present case, it is difficult to conclude that Vargas lacked any meaningful opportunity to object to the court's imposition of the upper term for voluntary manslaughter. The court indicated that it was going to impose a greater sentence on Vargas than it imposed on Herrera, who received the lower term of three years for voluntary manslaughter, when it stated, "So as opposed to Ms. Herrera, you're into this a lot deeper than she is, which is why you're getting a different sentence." The court also articulated the reasons for its decision to impose a "different sentence." Vargas's counsel could have asked to be heard regarding that decision when the court asked him if he waived arraignment for pronouncement of judgment and sentence and whether there was legal cause why judgment should not be pronounced. Counsel also could have voiced objections to the sentence immediately after the court pronounced it. However, in light

33

of the California Supreme Court's directive that the trial court must describe the sentence it intends to impose and give the parties an opportunity to object to the proposed sentence *before the actual sentencing*, we decline to apply the *Scott* waiver rule. (*Gonzalez, supra,* 31 Cal.4th at p. 752 ["The parties are given an adequate opportunity to seek such clarifications or changes if, at *any time* during the sentencing hearing, the trial court describes the sentence it intends to impose and the reasons for the sentence, and the court *thereafter considers the objections of the parties before the actual sentencing*" (second italics added)]; *Scott, supra,* 9 Cal.4th at p. 356 [A meaningful opportunity to object to sentencing can occur "only if, during the course of the sentencing hearing itself and *before objections are made*, the parties are clearly apprised of the sentence the court intends to impose and the reasons that support any discretionary choices." (Italics added.)].)

Regarding the merits of Vargas's challenge to her sentence, we review the "trial court's sentencing choice for an abuse of discretion and reverse only when there is a clear showing the sentence is arbitrary or irrational." (*People v. Ogg* (2013) 219 Cal.App.4th 173, 185, citing *People v. Sandoval* (2007) 41 Cal.4th 825, 847; *People v. Castellano* (1983) 140 Cal.App.3d 608, 614-615 [trial court's imposition of upper term sentence reviewed for an abuse of discretion].) " 'The burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary. [Citation.] In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence

34

will not be set aside on review.' " (*People v. Superior Court (Alvarez )* (1997) 14 Cal.4th 968, 977-978.) We presume that the trial court considered all of the relevant factors in choosing a sentence unless the record shows otherwise. (*People v. Myers* (1999) 69 Cal.App.4th 305, 310.) "Only a single aggravating factor is required to impose the upper term . . . ." (*People v. Osband* (1996) 13 Cal.4th 622, 728.)

We conclude that Vargas has not met her burden to show that the court's imposition of the upper term was irrational or arbitrary. The court explained that it intended to give Vargas a harsher sentence than Herrera received because Vargas was "significantly more involved . . . as a perpetrator . . . in this whole situation regarding this victim." The court noted that Vargas directly participated in the robbery by relating Penix's directives to Pineda in Spanish. The court stated, "Not only were you there, but I am convinced that your actions played a role in what happened to this poor man." Although the court did not specify all of the evidence supporting its observation that Vargas played a greater role in the attempted robbery and murder than Herrera, we presume that the court considered such evidence, including Vargas's testimony that she was the one who approached Pineda in front of the tattoo shop and initiated the deceptive transaction that led to his demise. In addition, the court presumably considered Vargas's probation report, which specified, as a circumstance in aggravation, that "[t]he crime involved great violence and great bodily harm resulting in the victim's death." As noted, a single factor in aggravation will support imposition of an upper term. (*People v.*

35

*Osband, supra,* 13 Cal.4th at p. 728.)  The court did not abuse its discretion in sentencing Vargas to the upper term for voluntary manslaughter.

IV.

DISPOSITION

The judgments are affirmed.


_____
AARON, J.

WE CONCUR:


_____
HUFFMAN, Acting P. J.


_____
IRION, J.